# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

FREDERICK WEBSTER,

     Plaintiff,

v.                                   Case No.  3:20-cv-333-MMH-MCR

CORIZON, LLC,

     Defendant.

_____

# **ORDER**

## **I. Status**

     Plaintiff, Frederick Webster, an inmate in the custody of the Florida Department of Corrections (FDOC), initiated this action by filing a pro se Civil Rights Complaint (Doc. 1) under 42 U.S.C. § 1983. He is proceeding in forma pauperis on a Second Amended Complaint (Doc. 13; SAC), filed with help from court appointed counsel.[1] One Defendant remains – Corizon, LLC (Corizon).[2] SAC at 2-3. Webster, who alleges he suffers residual effects from a prior

---

[1] Soon after Webster initiated this action, the Court sua sponte appointed counsel to represent him. Doc. 5. After counsel filed the SAC on Webster's behalf, the Court granted counsel's unopposed motion to withdraw. Doc. 48. Webster is now proceeding pro se.

[2] Webster originally named Centurion of Florida, LLC, and the FDOC as additional Defendants, but the Court granted Webster's motions to voluntarily dismiss with prejudice all claims against those Defendants. See Docs. 73, 91.

Hepatitis C (HCV) infection, argues that Defendant Corizon violated his Eighth Amendment right to be free from cruel and unusual punishment when it refused to provide Webster with lifesaving HCV treatment because of a cost-saving policy. Id. at 12-21. As relief, Webster seeks declaratory relief, compensatory and punitive damages, as well as attorney's fees and costs. Id. at 20.

Before the Court is Corizon's Motion for Summary Judgment. See Defendant Corizon, LLC's Motion for Summary Judgment (Doc. 87; Corizon Motion) with Exhibits (Doc. 86-1 through Doc. 86-6). The Court advised Webster of Federal Rule of Civil Procedure 56, notified him that granting a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and allowed him to respond to the Motion. See Order of Special Appointment (Doc. 14). Webster filed a Response. See Plaintiff's Response in Opposition to Defendant Corizon's Motion for Summary Judgment and Incorporated Memorandum [of] Law (Doc. 89; Webster Resp.) with Exhibits (Doc. 89-1 through Doc. 89-4). Corizon replied. See Defendant Corizon, LLC's Reply Memorandum in Support of Its Motion for Summary Judgment (Doc. 93). And Webster filed a Supplemental Response. See Plaintiff's Supplemental Response in Opposition of Corizon's Supplemental Reply Memorandum in Support of its Motion for Summary Judgment (Doc. 94). Corizon's Motion is ripe for review.

## II. Webster's Allegations

In his SAC, Webster raises four claims for relief. <u>See generally</u> SAC. Because Webster's claim against Corizon is the only claim that remains, the Court limits its summary to the allegations involving Corizon.

Webster alleges that he entered FDOC custody in 1986. <u>Id.</u> at 7. Although it is unclear when Webster received his HCV diagnosis, he contends that when he entered FDOC custody, officials conducted a physical exam and determined Webster suffered from decompensated cirrhosis stemming from chronic HCV. <u>Id.</u> at 7-8. He maintains that chronic HCV is a serious medical need that can cause, <u>inter alia</u>, liver inflammation, liver fibrosis, cirrhosis, and possible death. <u>Id.</u> at 3-4. Webster asserts that in 2013, a new class of drugs known as direct-acting antivirals (DAAs) became available to HCV patients. <u>Id.</u> at 5. He argues DAAs are oral medications with few side effects that cure HCV at a rate over 95%. <u>Id.</u> According to Webster, in 2014, the American Association for the Study of Liver Diseases (AASLD) and the Infectious Disease Society of America (IDSA) recommended DAA treatment for all persons with chronic HCV. <u>Id.</u> And since 2014, DAA treatment "has been the standard of care for the treatment of HCV . . . ." <u>Id.</u>

Webster alleges that Corizon contracted with the FDOC to provide health care services to FDOC prisoners, like Webster, from October 2012 until May 2016. <u>Id.</u> at 2-3. Webster argues that Corizon officials knew about DAAs

3

when the medication became available in 2013 and knew in 2013 that DAAs were the only acceptable treatment for chronic HCV. Id. at 7. He also contends that Corizon knew that thousands of FDOC prisoners suffered from HCV, but it wholly refused to provide DAAs or any other treatment for the virus. Id. According to Webster, Corizon "failed to provide these lifesaving medications to thousands of prisoners with HCV, in contravention of the prevailing standard of care and in deliberate indifference to the serious medical needs of prisoners with HCV." Id. at 6.

Webster asserts that in 2014, Corizon took Webster's blood samples confirming he had decompensated cirrhosis. Id. at 7. According to Webster, every ninety days, Webster underwent further medical testing indicating his decompensated cirrhosis had become severe. Id. at 7-8. From September 2014 until May 2016, however, Corizon refused to provide him with DAA treatment despite knowing that his condition prioritized him for such treatment. Id. at 8. According to Webster, Corizon denied him this treatment because Corizon "had a policy, practice, and custom of not providing [DAAs] to patients with HCV, in part to save costs and to make larger profits." Id. at 9. He argues that because of Corizon's practice, policy, and custom of refusing to treat Plaintiff with DAAs, "he sustained serious damage to his health and an increased risk of future health complication." Id. at 9. Webster contends that Centurion replaced Corizon in April 2016 and began providing health care services to

prisoners, like Webster, in FDOC custody in May 2016. Id. at 3. According to Webster, Centurion provided DAA treatment after prisoners sought injunctive relief against the FDOC in May 2017, and Webster finally received treatment and was cured of the disease in April 2018. Id. at 10.

Based on these facts, Webster alleges that Corizon's conduct amounts to deliberate indifference to his serious medical needs in violation of the Eighth Amendment. Id. at 11. He asserts that Corizon "knew that [] Webster suffered from a serious medical need, and knew that failing to treat him subjected him to a substantial risk of serious harm." Id. at 13. He also contends that "[a]s a direct and proximate cause of [Corizon's] policy, practice, and custom, and deliberate indifference to [Webster's] serious medical needs, [Webster] has suffered and will [] continue to suffer from[] harm." Id. at 13. He asserts that he "experiences fatigue, mild depression, joint pain, brain fog, swelling and pain near [his] liver, irritable bowel movement, and sleep disorder." Id. at 11. Webster maintains that the delay in treatment worsened his cirrhosis, and he is now "at heightened risk for developing further symptoms including further advanced liver failure, liver cancer, and death." Id.

### III. Summary of Record Evidence and Parties' Postitions[3]

### a. Record of HCV Standard of Care Between 2013 and 2016

HCV is a bloodborne virus that primarily attacks the liver and can cause liver scarring or "fibrosis." See Hoffer v. Sec'y, Fla. Dep't of Corr., 973 F.3d 1263, 1267 (11th Cir. 2020). The severity of liver fibrosis is typically measured on a five-step scale: F0 (no fibrosis), F1 (mild fibrosis), F2 (moderate fibrosis), F3 (severe fibrosis), and F4 (cirrhosis). Id. According to Dr. Gregory Ladele, Corizon's National Medical Director, the Federal Bureau of Prisons (BOP) issues the policy guidelines for inmate HCV treatment and "define[s] the optimal management of [HCV] infection in prisoners." Doc. 86-1 at 1. When Corizon was providing medical services to FDOC inmates, the BOP guidelines on HCV treatment were "constantly evolving." Corizon Motion at 4. In late 2013, the FDA approved the first highly effective DAAs – Olysio and Sovaldi. Doc. 86-1 at 1. The FDA then approved DAAs "Harvoni and Viekira Pak in late 2014, and Daklinza in mid-2015." Id. at 2. Dr. Ladele explains that the FDA's

---

[3] In support of its Motion, Corizon provides: the Declaration of Gregory Ladele, M.D., outlining Corizon's treatment plan for FDOC inmates with HCV, including its treatment of Webster, see Doc. 86-1, Doc. 86-2; Corizon's November 2015 notice to the FDOC cancelling its contract, see Doc. 86-3; and several of Webster's Chronic Illness Clinic records, lab reports, and ultrasound reports from 2013, 2014, 2015, 2016, 2018, 2019, and 2020, see Doc. 86-4, Doc. 86-5, Doc. 86-6. In support of his Response, Webster provides: several medical records from 2000 and 2001, see Doc. 89-1; Corizon's November 2015 notice to the FDOC cancelling its contract, see Doc. 89-2; medical records from 2013 through 2016, see Doc. 89-3; and medical records from 2018, see Doc. 89-4. The Court summarizes the parties' exhibits and pleadings, in concert, to provide a chronological summary of the record evidence.

approval of DAAs, or the "Sovaldi-class of medications," "was a singular event"; and "[w]hen combined with other [DAAs] in Harvoni, Viekira Pak[,] and subsequently other combination products, these medications promised a high rate of cure for [HCV] without the side effects of previous medication regimens," including "Interferon, a medication with debilitating side-effects." Id.

But FDA approval did not mean that DAAs were readily available for Corizon's use in treating FDOC inmates. Id. Indeed, when Sovaldi was introduced in 2013, its estimated per-patient cost was $84,000, and when Harvoni was released in late 2014, its estimated per-patient cost was nearly $95,000, which were expenses "[n]o company, including Corizon, could absorb." Id.; see also Corizon Motion at 2. Instead, according to Dr. Ladele, for Corizon to provide this new HCV treatment to FDOC inmates, "[t]he funding [for DAAs] had to come from the Florida Legislature." Doc. 86-1 at 2. Thus, Corizon and Dr. Ogunsanwo, the FDOC's Assistant Secretary for Health Services, repeatedly asked the FDOC to contact the Florida Legislature about obtaining funding for "Harvoni and similar [DAAs]." Id. But all Corizon's requests for legislative funding were denied. Id.

"Corizon also attempted to obtain the medications without cost from the manufacturer in return for providing data." Id. Indeed, because the national HCV treatment guidelines were still being developed, and hoping its labors

7

would result in receiving the medication, Corizon proactively engaged in the daunting task of collecting research data on all HCV-positive inmates. Id. at 2-3. For more than a year, Corizon conducted thousands of HCV clinic exams, during which Corizon accumulated laboratory values to determine which HCV-positive inmates should be prioritized for DAA treatment. Id. at 2-3. Corizon centrally stored the data and provides a copy of a 120-page chart listing information for the 4,731 HCV-positive inmates Corizon monitored. See generally Doc. 86-2. The chart includes each inmate's: ALT (alanine aminotransferase) and AST (aspartate aminotransferase) scores, which are liver enzymes; platelet count; total bilirubin level; and APRI (aspartate aminotransferase to platelet ratio) score, which estimates the severity of liver disease in inmates with HCV. See generally id. However, despite Corizon's analytic efforts, it still could not acquire DAA medication for FDOC inmates. Doc. 86-1 at 2.

The BOP also gradually revised its HCV guidelines to account for the high cost of DAA treatment. In June 2014, the BOP recommended using DAAs only in the most serious cases, as it anticipated more efficient and less expensive medications would soon be available. Corizon Motion at 4. According to Dr. Ladele, the 2014 BOP guidelines stated:

> The preferred treatment regimen has changed with each of the new recently approved, direct-acting antiviral medications (DAAs) – resulting in rapidly

changing clinical guidelines and treatment recommendations. While an all-oral, interferon-free regimen is currently available for certain genotypes, even newer medications are expected to become available that will be safer, simpler, and more effective. In the midst of this rapidly changing treatment landscape, the most recently published guidance on HCV treatment (www.hcvguidelines.org) indicates that it is reasonable to postpone treatment for cases with less advanced fibrosis, pending the expected availability of better treatments in the very near future. During this time of transition, the BOP has established treatment priorities for inmates who have a more urgent need for intervention . . . .

Doc. 86-1 at 3-4. Dr. Ladele explains that the first BOP HCV guideline "to advocate use of [DAAs] in patients without advanced liver fibrosis or other high-priority conditions was issued in July 2015." Id. at 2. But in its July 2015 updated guideline, the BOP reiterated that providers should still prioritize their administration of DAAs. Id. at 4. It stated, "AASLD/IDSA/IAS-USA [(International Antiviral Society – USA)] guidelines also indicate that it is reasonable during this time of transition to prioritize for treatment those HCV cases with the most urgent need." Id.

In November 2015, "when it became clear that additional funding, including funding for [HCV] treatment, was not coming, Corizon provided notice of cancellation of its contract to the FDOC" largely because the FDOC failed to obtain funding for DAAs. Id.; see also Doc. 86-3 at 1; Corizon Motion at 3. Corizon stopped providing medical services for the FDOC on May 31,

2016. Doc. 86-3 at 1; Doc. 86-1 at 4. During Corizon's contract with the FDOC, the FDOC did not add DAAs to its approved list of medications that Corizon physicians could prescribe. See Corizon Motion at 3.

Dr. Ladele explains that several partnerships between Corizon and other state governments were more successful in obtaining the necessary legislative funding for DAA treatment in HCV-positive inmates. Doc. 86-1 at 4. According to Dr. Ladele, in 2013, the Michigan Department of Corrections (MDOC), which already had a "large-volume pegylated interferon plus ribavirin program" to treat HCV in prisoners, began a "small-scale use of hybrid therapy with early [DAAs]." Id. In 2015, the MDOC transitioned to "small-moderate scale all-DAA therapy, and finally to large-scale all DAA therapy in early 2016." Id. According to Dr. Ladele, "[s]uccessfully educating key state administration and legislative leaders required a sustained and arduous effort." Id. at 4-5. And he explains that Arizona, Kansas, and Missouri are other past and present Corizon client-states that transitioned to high-volume DAA treatment programs. Id. at 5.

### b. Record of Webster's Medical Care

Webster entered the FDOC's custody in September 1986. Webster Resp. at 4. Although the exact date of diagnosis is unclear, the FDOC's Chronic Illness Clinic evaluated Webster on April 18, 2000 and noted he suffered from

HIV, HCV, and hypertension.[4] Doc. 89-1 at 24. The Chronic Illness Clinic continued to monitor Webster's HIV and HCV between May 2000 and November 2001 through regular blood tests and in-person assessments. See generally id. Webster's medical records during those dates indicate he had no complaints about his HCV and was tolerating his medications well. Id.

Corizon began providing medical services to certain FDOC inmates, including Webster, in 2012.[5] SAC at 3. On December 10, 2013, Corizon collected blood samples from Webster for a complete metabolic panel and blood count. Doc. 86-5 at 1-4. On December 18, 2013, Corizon evaluated Webster in the Chronic Illness Clinic, reviewed his lab results, and noted his HCV was "controlled" and "asymptomatic." Doc. 86-4 at 1. Corizon ordered Webster to undergo additional labs and return to the Chronic Illness Clinic in April 2014. Id. It conducted further lab work and collected samples from Webster in January 2014 and March 2014. Doc. 86-5 at 5-14. Webster returned to the Chronic Illness Clinic on May 6, 2014, where Corizon documented that his

---

[4] Although the handwriting on his medical records is difficult to read, it also appears that medical noted Webster suffered from hyperlipidemia. See Doc. 89-1.

[5] In its Motion, Corizon alleges it began providing medical services to FDOC inmates in September 2013. Corizon Motion at 2. The Court, however, views the facts in the light most favorable to Webster who alleges Corizon began providing services in 2012. SAC at 3. But this discrepancy is immaterial because the relevant date range for purposes of this Order is 2013 to 2016 and the parties do not dispute that Corizon was the FDOC's medical provider during that timeframe.

HCV remained controlled and asymptomatic. Doc. 86-4 at 2. Medical ordered Webster to return for a follow-up in three months. Id.

In July 2014, Webster underwent further lab tests. Doc. 86-5 at 15-17. During his Chronic Illness Clinic visit on August 11, 2014, Corizon medial staff reviewed Webster's lab reports and noted his HCV was "controlled." Doc. 86-4 at 3. However, because Webster's July 2014 lab results showed his ALT and AST numbers were elevated, Corizon ordered that Webster undergo an abdomen and liver ultrasound. Id.; see Doc. 86-5 at 15. At that time, Corizon was accumulating its data on HCV-positive inmates and Webster was one of the 4,731 inmates in the study and being staged for treatment. Doc. 86-1 at 3. According to the chart Corizon compiled to prioritize the HCV-positive inmates, the data Corizon listed for Webster included his July 2014 elevated ALT and AST scores. See Doc. 86-2 at 33. The chart also included Webster's July 2014 APRI number, which was 0.762. Id. In his Declaration, Dr. Ladele explains that when comparing those lab results to other HCV-positive inmates in the data chart, "Webster was not among the patients with the greatest need" for immediate DAA treatment despite his elevated liver enzymes. Doc. 86-1 at 3.

According to Dr. Ladele, Webster's 2014 ultrasound also showed "none of the usual signs of cirrhosis, such as nodules, fibrosis, varices, ascites and markedly increased portal vein hypertension." Id. Indeed, Corizon conducted

its first ultrasound on August 22, 2014, during which it found Webster's "liver [was] normal and homogenous in echogenicity measuring 11.8 cm." Doc. 86-6 at 1. It found "[t]here [was] no evidence of intrahepatic ductal dilation[,] [t]he portal vein demonstrate[ed] hepatopetal flow[,] [t]he common bile duct measures 0.3 cm," and the "spleen [was] unremarkable measuring 10.2 x 4.5 x 5.3 cm." Id. Based on these findings, the medical department's documented impression was "normal liver and spleen [and] [l]imited imaging of the gallbladder and right kidney [were] normal." Id. Medical recommended that he "[f]ollow up as clinically indicated." Id.

Webster underwent a follow-up lab test in September 2014, which showed that his AST and ALT scores were within normal range. Doc. 86-5 at 20-21. Corizon again conducted lab work on Webster in November 2014, id. at 22-24; January 2015, id. at 25-27; and on February 10, 2015, id. at 28-33. On February 20, 2015, medical evaluated Webster in the Chronic Illness Clinic, during which it assessed the progression of Webster's HCV and noted he had a APRI score of 1.02. Doc. 86-4 at 4. Webster's discussed medical plan was diet and exercise with a follow-up visit scheduled for June 2015. Id. Webster underwent additional lab work about four days later, on February 24, 2015, Doc. 86-5 at 34, and again in March and May 2015, id. at 35, 36-38.

On June 11, 2015, medical evaluated Webster in the Chronic Illness Clinic, at which time he advised medical, "I am doing ok, but would like to get

in the new Hepatitis C program." Doc. 86-4 at 5. Medical ordered additional lab work and recommended Webster adhere to a diet and exercise regimen with a follow-up appointment in three months. Id. Webster underwent lab work in July 2015, Doc. 86-5 at 39-42, and on September 5, 2015, id. at 43. Medical went over Webster's updated labs during a Chronic Illness Clinic visit on September 11, 2015. Doc. 86-4 at 6. During his evaluation, Webster advised medical he had no complaints. Id. Medical renewed his medications, ordered additional lab work, and scheduled him for a follow-up visit in six months. Id.

On November 10, 2015, Corizon collected more lab work from Webster. Doc. 86-5 at 44-50. Later that month, on November 30, 2015, Corizon submitted its notice cancelling its contract with the FDOC with an effective date of May 31, 2016. Doc. 86-3. Corizon continued to conduct lab work on Webster in December 2015, Doc. 86-5 at 51-54, and February 2016, id. at 55-57. Corizon then evaluated Webster for the final time in the Chronic Illness Clinic on March 4, 2016. Doc. 86-4 at 7. During the evaluation, Webster reported that he was "doing ok," medical reviewed his lab work, and ordered a follow-up in four months. Id.

Centurion took over medical care at Webster's correctional facility and evaluated him in the Chronic Illness Clinic on August 31, 2016. Id. at 8. Webster reported no complaints at that time, and medical ordered lab work to test his quantitative HCV viral load. Id. On February 27, 2018, Centurion

conducted an ultrasound on Webster's abdomen and liver. Doc. 86-6 at 2. It showed that Webster's "liver, hepatobiliary ductal system, gallbladder, and spleen [were] normal[,] [n]o ascites[,] [and] [n]ormal hepatopedal portal vein flow." Id. Webster's "[g]reatest liver length [was] 14.9 CM, CBD diameter [was] 2.9 mm, main portal vein diameter [was] 10.3 mm, main portal vein peak systolic velocity [was] 41.85 cm/s, and splenic length [was] 10.4 CM." Id. Based on these observations, medical concluded Webster had "[m]ild elevation in main portal vein peak systolic velocity" and a "[r]ight renal parenchymal simple cyst," but "[o]therwise negative exam." Id.

On March 26, 2018, Centurion conducted an HCV counseling session with Webster and documented that Webster showed evidence of "hepatofungal blood flow," but no evidence of "heter[o]genicity or increased diffuse echogenicity" and no evidence of "[l]iver [e]dge nodularity." Doc. 89-4 at 3. However, it noted that Webster's "FibroSure" stage was F4, which suggested liver cirrhosis.[6] Id.; see also Hoffer, 973 F.3d at 1267. As such, Centurion ordered that Webster begin a treatment course of the DAA medication Epclusa and scheduled a follow-up in two-to-four weeks to discuss tolerability. Id. Webster was then considered cured of the infection in April 2018. See Corizon Motion at 8; Webster Resp. at 5. Centurion conducted a post HCV treatment

---

[6] The FDOC sometimes uses the "FibroSure" test to estimate an inmate's fibrosis stage. See Hoffer v. Inch, 382 F. Supp. 3d 1288, 1300 (N.D. Fla. 2019).

follow-up on May 2, 2018, during which Webster advised that he felt good, was not experiencing any problems or side effects, and voiced no complaints or concerns. Doc. 89-4 at 2. Webster then underwent ultrasounds of his liver in May 2019, Doc. 86-6 at 4, and April 2020, id. at 5, both of which showed Webster's liver was normal in appearance. According to Dr. Ladele, Webster's ultrasound from 2020, "after he was cured, [again] show[ed] none of the usual signs of cirrhosis, such as nodules, fibrosis, varices, ascites and markedly increased portal vein hypertension." Doc. 86-1 at 5.

## IV. Standard of Review for Summary Judgment

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to

defeat a motion for summary judgment." Kesinger ex rel. Est. of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Summary judgment is improper, however, if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." <u>Guevara v. NCL (Bahamas) Ltd.</u>, 920 F.3d 710, 720 (11th Cir. 2019) (quotation marks and citation omitted).

## V. Eighth Amendment

"To establish an Eighth Amendment violation, a prisoner must satisfy both an objective and subjective inquiry regarding a prison official's conduct." <u>Oliver v. Fuhrman</u>, 739 F. App'x 968, 969 (11th Cir. 2018)[7] (citing <u>Chandler v. Crosby</u>, 379 F.3d 1278, 1289 (11th Cir. 2004)). The Eleventh Circuit has explained:

> Under the objective component, a prisoner must allege a condition that is sufficiently serious to violate the Eighth Amendment. <u>Id.</u> The challenged condition must be extreme and must pose an unreasonable risk of serious damage to the prisoner's future health or safety. <u>Id.</u> The Eighth Amendment guarantees that prisoners are provided with a minimal civilized level of life's basic necessities. <u>Id.</u>

> Under the subjective component, a prisoner must allege that the prison official, at a minimum, acted with a state of mind that constituted deliberate indifference. <u>Id.</u> This means the prisoner must show that the prison officials: (1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) displayed conduct that is more than [gross] negligence. <u>Farrow v. West</u>, 320 F.3d 1235, 1245 (11th Cir. 2003).

---

[7] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. <u>See</u> <u>McNamara v. GEICO</u>, 30 F.4th 1055, 1060–61 (11th Cir. 2022); <u>see generally</u> Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

Id. at 969-70. "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." Whitley v. Albers, 475 U.S. 312, 319 (1986).

As it relates to medical care, "[t]he Supreme Court has interpreted the Eighth Amendment to prohibit 'deliberate indifference to serious medical needs of prisoners.'" Melton v. Abston, 841 F.3d 1207, 1220 (11th Cir. 2016) (quoting Estelle v. Gamble, 429 U.S. 97, 102 (1976)). The Eleventh Circuit has explained that

> To prevail on a deliberate indifference claim, [a plaintiff] must show: "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir.2009). To establish deliberate indifference, [a plaintiff] must prove "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Townsend v. Jefferson Cnty., 601 F.3d 1152, 1158 (11th Cir.2010) (alteration in original). The defendants must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and then actually draw that inference. Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003) (quotation omitted).

Easley v. Dep't of Corr., 590 F. App'x 860, 868 (11th Cir. 2014). see also Patel v. Lanier Cnty. Ga., 969 F.3d 1173, 1188-89 & n.10 (11th Cir. 2020) (recognizing "a tension within [Eleventh Circuit] precedent regarding the

minimum standard for culpability under the deliberate-indifference standard," as some cases have used "more than <u>gross</u> negligence" while others have used "more than <u>mere</u> negligence"; finding, however, that it may be "a distinction without a difference" because "no matter how serious the negligence, conduct that can't fairly be characterized as <u>reckless</u> won't meet the Supreme Court's standard" (citations omitted)); <u>see</u> <u>Ireland v. Prummell</u>, 53 F.4th 1274, , 1287 n.5 (11th Cir. 2022) (again acknowledging the "tension" within Eleventh Circuit precedent, but stating "we believe that a <u>more</u> than gross negligence culpability standard is the correct standard under the deliberate indifference framework").

"For medical treatment to rise to the level of a constitutional violation, the care must be 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" <u>Nimmons v. Aviles</u>, 409 F. App'x 295, 297 (11th Cir. 2011) (quoting <u>Harris v. Thigpen</u>, 941 F.2d 1495, 1505 (11th Cir.1991)); <u>see also</u> <u>Waldrop v. Evans</u>, 871 F.2d 1030, 1033 (11th Cir. 1989) ("Grossly incompetent or inadequate care can constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment" or fail to respond to a known medical problem).

Notably, the law is well settled that the Constitution is not implicated by the negligent acts of corrections officials and medical personnel. <u>Daniels v. Williams</u>, 474 U.S. 327, 330-31 (1986); <u>Davidson v. Cannon</u>, 474 U.S. 344, 348

20

(1986) ("As we held in <u>Daniels</u>, the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials."). As such, a complaint that a physician has been negligent "in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." <u>Bingham v. Thomas</u>, 654 F.3d 1171, 1176 (11th Cir. 2011) (quotation marks and citation omitted).

Disagreement over the mode of treatment does not constitute deliberate indifference for the Eighth Amendment. <u>See</u> <u>Hamm v. Dekalb Cnty.</u>, 774 F.2d 1567, 1575 (11th Cir. 1985) ("[A]n inmate's desire for a different mode of treatment does not rise to the level of deliberate indifference."). Similarly, "the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." <u>Adams v. Poag</u>, 61 F.3d 1537, 1545 (11th Cir. 1995) (citation omitted). Also, even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must prove harm caused by the indifference. <u>See</u> <u>Hunt v. Dental Dep't</u>, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

Additionally, where a deliberate indifference medical claim is brought against an entity, such as Corizon, based upon its functional equivalence to a

government entity, the assertion of a constitutional violation is merely the first hurdle in a plaintiff's case. This is so because liability for constitutional deprivations under § 1983 cannot be based on the theory of respondeat superior. Craig v. Floyd Cnty., Ga., 643 F.3d 1306, 1310 (11th Cir. 2011) (quoting Grech v. Clayton Cnty., Ga., 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc)); see Denno v. Sch. Bd. Of Volusia Cnty., 218 F.3d 1267, 1276 (11th Cir. 2000). Instead, a government entity may be liable in a § 1983 action "only where the [government entity] itself causes the constitutional violation at issue." Cook ex. rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1116 (11th Cir. 2005) (citations omitted). Thus, a plaintiff must establish that an official policy or custom of the government entity was the "moving force" behind the alleged constitutional deprivation. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 693-94 (1978).

In Monell, the Supreme Court held that local governments can be held liable for constitutional torts caused by official policies. However, such liability is limited to "acts which the [government entity] has officially sanctioned or ordered." Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986). Under the directives of Monell, a plaintiff also must allege that the constitutional deprivation was the result of "an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law." Denno, 218 F.3d

22

at 1276 (citations omitted); see Hoefling v. City of Miami, 811 F.3d 1271, 1279 (11th Cir. 2016) (stating Monell "is meant to limit § 1983 liability to 'acts which the municipality has officially sanctioned or ordered'"; adding that "[t]here are, however, several different ways of establishing municipal liability under § 1983").

"A policy is a decision that is officially adopted by the [government entity] or created by an official of such rank that he or she could be said to be acting on behalf of the [government entity]." Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997) (citation omitted). The policy requirement is designed to "'distinguish acts of the [government entity] from acts of employees of the [government entity], and thereby make clear that [governmental] liability is limited to action for which the [government entity] is actually responsible.'" Grech, 335 F.3d at 1329 n.5 (quotation and citation omitted). Indeed, governmental liability arises under § 1983 only where "'a deliberate choice to follow a course of action is made from among various alternatives'" by governmental policymakers. City of Canton v. Harris, 489 U.S. 378, 389 (1989) (quoting Pembaur, 475 U.S. at 483-84). A government entity rarely will have an officially-adopted policy that permits a particular constitutional violation, therefore, in order to state a cause of action for damages under § 1983, most plaintiffs must demonstrate that the government entity has a custom or practice of permitting the violation. See Grech, 335 F.3d at 1330; McDowell v.

<u>Brown</u>, 392 F.3d 1283, 1289 (11th Cir. 2004). A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." <u>Bd. Of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown</u>, 520 U.S. 397, 404 (1997) (citation omitted). The Eleventh Circuit has defined "custom" as "a practice that is so settled and permanent that it takes on the force of law" or a "persistent and wide-spread practice." <u>Sewell</u>, 117 F.3d at 489. Last, "[t]o hold the [government entity] liable, there must be 'a direct causal link between [its] policy or custom and the alleged constitutional deprivation.'" <u>Snow ex rel. Snow v. City of Citronelle</u>, 420 F.3d 1262, 1271 (11th Cir. 2005) (quotation omitted).

## VI. Analysis

Corizon argues that it is entitled to summary judgment because Webster has failed to establish an Eighth Amendment violation.[8] <u>See generally</u> Corizon Motion at 10-23.

---

[8] Corizon also argues it is entitled to summary judgment because Webster's action is barred by the three-strikes rule under 28 U.S.C. § 1915(g). Corizon Motion at 8-10. Corizon made this argument in its Motion to Dismiss, and the Court denied the issue. <u>See</u> Doc. 60 at 12-13. Thus, the Court denies it for the reasons previously stated.

24

### a. Serious Medical Need

Corizon does not dispute that Webster established that his HCV constituted a serious medical need. Thus, the Court considers only whether Corizon's actions amounted to deliberate indifference.

### b. Deliberate Indifference

Corizon argues it did not act deliberately indifferent because even though Webster did not receive DAA treatment during Corizon's care, Corizon consistently monitored Webster's condition and facilitated regular examinations and testing. Corizon Motion at 22. According to Corizon, when it was providing medical services to FDOC inmates, the estimated total cost of providing DAA treatment to HCV-positive inmates exceeded $700 million. Id. at 20. Corizon asserts the astronomical cost was a national dilemma not only affecting Corizon's ability to provide treatment but also preventing all healthcare providers from readily offering DAAs. Id. Relying on Hoffer, 973 F.3d at 1279, Corizon contends it was not precluded from considering costs when providing medical care; and because of the expense and "[i]n the face of this nightmare, [it] did what was required by the []BOP guidelines: it prioritized and staged patients, including Webster, for treatment when funding became available." Id. at 21. To that end, Corizon argues it did not have a policy of denying treatment based on cost but instead "had a policy of trying to get the funding" to provide the treatment. Id. at 22. However,

according to Corizon, "[t]hat policy was thwarted by the [FDOC], which despite promises to the contrary, never sought funding from the Florida Legislature." Id. at 22.

In his Response, Webster argues that Corizon knew that his HCV had progressed to decompensated cirrhosis in 2014 and that all lab results Corizon ordered from that point on reaffirmed Webster's deteriorating condition. Webster Resp. at 4. According to Webster, Corizon knew that the medical standard of care in 2014 and after was to immediately provide DAA treatment to him and other prisoners with chronic HCV but Corizon followed a cost-saving policy and practice to deny that medication. Id. Notably, he contends "Corizon failed to provide [him] with any type of medical treatment for his HCV infection at any time during its contractual agreement with FDOC." Id. According to Webster, Corizon cannot solely rely on costs to explain its decision as "'funding is no excuse' for a failure to provide [HCV] treatment." Id. at 12 (citing Hoffer v. Jones, 290 F. Supp. 3d 1292, 1296 (N.D. Fla. 2017)). He "submits that if [] Corizon had provided him medical treatment for his chronic HCV infection[,] [he] would not have suffered irreversible liver damage," which "will eventually result in liver cancer and death." Id. at 11-13.

In the Hoffer litigation, the Northern District of Florida certified a class consisting of "all current and future prisoners in the custody of the Florida Department of Corrections who have been diagnosed, or will be diagnosed,

26

with" HCV. Hoffer v. Jones, 323 F.R.D. 694, 700 (N.D. Fla. 2017). The plaintiffs sued the Secretary of the FDOC in her official capacity, alleging the denial of DAAs under a cost-savings policy violated, inter alia, the Eighth Amendment. Id. at 696. Following an evidentiary hearing, on November 17, 2017, the court granted the plaintiffs' request for a preliminary injunction and issued an opinion. See Hoffer, 290 F. Supp. 3d at 1306. After resolving issues raised on summary judgment, on April 18, 2019, the court entered a permanent injunction mandating that the FDOC provide DAA treatment for all HCV-positive inmates, including those with only mild or no liver fibrosis, and finding that "[t]he only reason why FD[O]C is electing not to provide [DAA] treatment is due to the cost of treatment, which is per se deliberate indifference." See Hoffer v. Inch, 382 F. Supp. 3d 1288, 1302 (N.D. Fla. 2019). The Secretary appealed the court's ruling on summary judgment, and on August 31, 2020, the Eleventh Circuit vacated the district court's permanent injunction; reversed the court's finding that the Secretary's treatment of HCV-positive inmates with little or no fibrosis (F0 and F1 level inmates) violated the Eighth Amendment, "with instruction to award summary judgment to the Secretary on that issue"; and remanded the rest of the district court's order, "so that it can make the findings required by the PLRA." Hoffer, 973 F.3d at 1279. The Eleventh Circuit reasoned that the Eighth Amendment does not prohibit prison officials from considering cost in determining what type of medical

27

treatment to provide, and since the Secretary had implemented a treatment plan that provides "minimally adequate care," the plaintiffs cannot say that her conduct in treating HCV-positive inmates amounted to deliberate indifference. Id. at 1277-78.

Corizon now relies on the Eleventh Circuit's 2020 Hoffer opinion to support its argument that it did not act deliberately indifferent to Webster's serious medical needs, because it was not prohibited from considering the cost of DAAs and it continuously monitored Webster's condition. Webster relies on the Northern District of Florida's Hoffer decisions to support his assertion that Corizon had to provide him with DAAs regardless of cost. The Court finds Webster's reliance is misplaced. First, Corizon was not a party in the Hoffer litigation. Rather, the plaintiffs in that case sought injunctive relief against only the Secretary, arguing the FDOC created a cost-saving policy and practice to deny HCV treatment and continued that denial despite changing its contracted medical provider. See Hoffer, 290 F. Supp. 3d at 1298 (summarizing the FDOC's history of failing to treat HCV and noting that the FDOC continued to deny treatment as Corizon's contract ended and Centurion's contract began). Second, and likely of more import, the Eleventh Circuit vacated the permanent injunction and found that "the Eighth Amendment does not prohibit prison officials from considering cost in determining what type (or level) of medical care inmates should receive." Hoffer, 973 F.3d at 1277. And the record shows

28

that Corizon acted reasonably in considering the cost of DAAs when determining the type of care to provide its HCV patients.

Notably, although the FDA first approved DAAs in late 2013, the record demonstrates that DAAs were not readily available to FDOC inmates in 2013, 2014, 2015, or 2016. When DAAs were introduced in 2013, its per-patient cost was $84,000 and in 2014 the per-patient cost was nearly $95,000. Corizon could not absorb that expense, but it went to great lengths to convince the FDOC to request funding from the Florida Legislature and it even asked the drug manufacturers to provide the medication at no cost. Indeed, Corizon spent a year accumulating extensive data on its HCV-positive inmates to prepare for DAA approval. It conducted liver function tests and regular medical evaluations in the Chronic Illness Clinic to prioritize those HCV-positive inmates for treatment. And Corizon's prioritization approach mirrored the BOP's 2014 and 2015 HCV treatment guidelines. But when Corizon realized all its efforts to obtain the medication were unsuccessful, Corizon cancelled its contract with the FDOC. Webster does not dispute any of these efforts.

The undisputed evidence in the record also shows that despite its inability to obtain DAAs, Corizon provided the required "minimally adequate care" to Webster. Webster's medical records from 2013, 2014, 2015, and 2016 show that Corizon employees regularly monitored Webster's HCV symptoms and liver function. Corizon ordered Webster to undergo lab tests almost

monthly and repeatedly evaluated him in the Chronic Illness Clinic, during which it almost always documented Webster's HCV as "controlled" or "asymptomatic." And there is no evidence that Webster complained to Corizon about his HCV symptoms during those Chronic Illness Clinic examinations. Corizon also ordered an ultrasound of Webster's liver in 2014, which showed that his liver appeared normal and presented "none of the usual signs of cirrhosis, such as nodules, fibrosis, varices, ascites and markedly increased portal vein hypertension." Doc. 86-1 at 5.

On June 11, 2015, during a Chronic Illness Clinic visit, Webster, for the first time, advised Corizon officials that although he was "doing ok," he "would like to get on the new Hepatitis C program." However, when Webster made that inquiry, Corizon had already included Webster in its HCV-treatment prioritization data and was regularly monitoring him for potential DAA treatment when and if that treatment became readily available. Unfortunately, the FDOC did not obtain DAA funding during Corizon's contract; and thus, Corizon was without the means to provide that treatment. Still, had Corizon received the funding and began providing DAAs under its prioritization chart, Dr. Ladele concludes that, at that time, "Webster was not among the patients with the greatest need." Id. at 3.

To that end, while the record shows that in 2018, after Centurion began providing medical services, medical documented Webster's "FibroSure score"

as F4, which suggests severe fibrosis or cirrhosis, it is unclear when Webster's fibrosis began or when it progressed to that level. And since Webster's condition may have progressed to that stage after May 2016, the Court cannot solely rely on that 2018 record to conclude that Corizon acted deliberately indifferent in monitoring Webster's HCV.

Viewing the facts in Webster's favor, Centurion provided Webster with DAAs and cured his HCV in April 2018. Much like his 2014 liver ultrasound, Webster's post-treatment 2019 and 2020 ultrasounds showed a normal liver with "none of the usual signs of cirrhosis, such as nodules, fibrosis, varices, ascites and markedly increased portal vein hypertension." Doc. 86-1 at 5; 86-6 at 4-5. Thus, only speculation supports Webster's allegation that his condition today is worse than it would have been had Corizon been the medical provider to treat him with DAAs, and Webster has submitted no evidence suggesting that any delay caused him to suffer the injuries alleged in his Second Amended Complaint. See Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994), overruled on other grounds by Hope v. Pelzer, 536 U.S. 730 (2002) ("An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.").

Corizon has discharged its burden, and Webster has failed to show that there is a genuine issue for trial. On this record, the facts do not show a

31

deliberate disregard for Webster's HCV or that Corizon's response to Webster's serious medical need was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Nimmons, 409 F. App'x at 297. Rather, Webster's allegations against Corizon hinge on his disagreement with Corizon's HCV monitoring protocol and its self-proclaimed "policy of trying to get [DAA] funding." See Corizon Motion at 22. But Webster's disagreement with Corizon's medical judgment at a time when DAA treatment was "constantly evolving" fails to demonstrate an Eighth Amendment violation. Harris, 941 F.2d at 1505. The record does not support Webster's claim that Corizon acted deliberately indifferent and summary judgment is due to be granted to Corizon.

Accordingly, it is

**ORDERED AND ADJUDGED:**

1.     Defendant Corizon's Motion for Summary Judgment (Doc. 87) is

**GRANTED**.

2.     The Clerk is **DIRECTED** to enter judgment in favor of Defendant

Corizon and against Plaintiff Webster and **CLOSE** the case.

**DONE AND ORDERED** at Jacksonville, Florida, this 5th day of

January, 2023.

**MARCIA MORALES HOWARD**
United States District Judge

Jax-7

C:     Frederick Webster, #856553
Counsel of Record